R. A. SCHRIEWER et al., Appellants,

v.

William C. LIEDTKE, Jr., et al., Appellees.

No. 8057.

Court of Civil Appeals of Texas, Beaumont.

Jan. 19, 1978.

Rehearing Denied Feb. 16, 1978.

Alfred L. Deaton, III, Houston, for appellants.

Richard B. Miller, Houston, for appellees.

KEITH, Justice.

This is a suit for specific performance of a contract for the sale of real property. The trial court entered a judgment on a directed verdict for plaintiffs, and defendants have perfected their appeal upon twenty-five points of error.

During 1972, William Liedtke, Jr., and George Jewell acquired approximately 1,040 acres of land in Austin County, Texas. On June 5, 1974, R. A. Schriewer, Trustee, entered into an earnest money contract with William C. Liedtke, Jr., individually, and as trustee, to purchase the property. Prior to that date, the contract terms were negotiated by Schriewer's attorney, Julian E. Weisler, II, and Liedtke's attorney and partner, George Jewell, but the contract was prepared by Weisler.

The contract required that the parties close "on or before one hundred twenty (120) days from the date of the execution of this contract"—October 3, 1974. Seller's obligations included: delivering good and marketable title, providing Owner's Title Policy "upon" closing, and keeping five first lien notes and all taxes current. Buyer's obligations included: paying $25,000 earnest money to an escrow agent upon execution of the contract, paying $287,000 cash upon closing, assuming the unpaid balance on five first lien notes, and executing three vendor's lien notes equal to one-half, one-fourth, and one-fourth of the balance of the purchase price to be secured by a second lien. The contract further provided that the buyer was to order an Owner's Title Policy Commitment and Title Report and to make any objections to the title within fifteen days after receiving the report, that the seller was to have thirty days to cure any objections, and then the buyer would have to notify him of his acceptance or rejection of curative work within ten days. The entire contract could be rejected by the buyer only if title failed as to ten percent or more of the acreage; otherwise, the purchase price would be reduced proportionately. There was no provision requiring a current survey.

Within fifteen days after the issuance of the Title Report, Weisler notified Jewell of two objections—one involving a 4.86-acre tract and the other involving a boundary line conflict affecting a 32-acre tract and a 33-acre tract—and the required reduction if the objections could not be cured. There was some discussion of possibly waiving these objections between Weisler and Jewell, but nothing was put in writing.

In mid-September without notice to plaintiff, Schriewer executed an assignment of his rights under the contract to J. B. Bumgardner, Sr., who had been planning to purchase the property with Schriewer. Schriewer later left for Africa to go on a long-scheduled hunting trip.

Around September 30, 1974, Bumgardner met with Weisler to gather information on the earnest money contract. But, on September 30th, he put Weisler on standby and retained another attorney, William C. Morris, III. He executed a power of attorney to Morris to represent him at the closing.

On October 3, 1974, Jewell received a letter from Morris informing him that he represented one of the principals and warning that if the two title objections were not cured by the closing, the deal would be cancelled.

On October 3, 1974, Jewell delivered the closing papers to the title company in Bellville and copies to *Weisler* and returned to Houston. Bumgardner and Morris went to the title company that afternoon, arriving shortly before closing time. After briefly reviewing the papers, Morris advised Bumgardner not to sign them. Morris telephoned Jewell and requested that he return to Bellville so that the closing could be completed, but Jewell refused to return since he could not get there during business hours.

On October 7th, Morris sent a letter to the Bellville Abstract Company requesting the return of the $25,000 earnest money to Schriewer, and explaining that the contract was cancelled "since Seller has failed among other things to cure the title objections properly raised that pertain to 10% or more of the acreage, and since he has refused to furnish us with a staked survey properly documented and certified to its accuracy by a registered engineer or surveyor of the State of Texas which is required to evidence good and marketable title . . ." Obviously, neither of the reasons assigned was valid.

The parties were unable to reach any amicable agreement in order to close; and, in November 1975, Liedtke and Jewell filed suit for specific performance. The court, after hearing evidence from both parties, granted a directed verdict for plaintiffs. The court decreed that the defendants specifically perform the contract as of October 3, 1974.

█ In an appeal from a directed verdict, we must determine whether there is any evidence of probative force to raise fact issues on any material questions presented. *Henderson v. Travelers Ins. Co.*, 544 S.W.2d 649, 650 (Tex.1976); *Tarkington v. Beneficial Finance Co.*, 516 S.W.2d 722, 722 (Tex. Civ.App.—Beaumont 1974, writ ref'd n. r. e.). We must examine the entire record and consider the evidence that is favorable to the party against whom the verdict was rendered—appellants—and disregard all contrary evidence and inferences. *Henderson*, supra (544 S.W.2d at 650); *Rogers v. Searle*, 544 S.W.2d 114, 115 (Tex.1976); *Anderson v. Moore*, 448 S.W.2d 105, 105 (Tex. 1969); *Tarkington*, supra (516 S.W.2d at 722). "When reasonable men may differ as to the truth of controlling facts, a jury issue is present." *Henderson*, supra (at 650); *accord, Najera v. Atlantic & Pacific Tea Co.*, 146 Tex. 367, 207 S.W.2d 365, 367 (1948).

Using the appropriate standards of review, we affirm the trial court's judgment for the reasons now to be stated.

In appellants' first three points of error, they complain that the earnest money contract is too indefinite, uncertain and incomplete with respect to the essential terms of the purchase money notes required therein to support a judgment of specific performance. We disagree.

█ Specific performance can be decreed if the essential terms of a contract are expressed with reasonable certainty. *Johnson v. Snell*, 504 S.W.2d 397, 398 (Tex.1973); *Langley v. Norris*, 141 Tex. 405, 173 S.W.2d 454, 459 (1943). Absolute certainty is not required. *Bryant v. Clark*, 163 Tex. 596, 358 S.W.2d 614, 615 (1962); *Langley*, supra (at 459); *Wilson v. Beaty*, 211 S.W. 524, 527 (Tex.Civ.App.—San Antonio 1919, writ ref'd); *Phillips v. Campbell*, 480 S.W.2d 250, 253 (Tex.Civ.App.—Houston [14th Dist.] 1972, writ ref'd n. r. e.).

The contract in question was drawn up by two experienced attorneys, both of whose clients wanted to make a valid contract. Therefore, we will view the contract as valid if we can interpret its terms with reasonable certainty. The contract specified that payments would be made on the purchase money notes as follows:

> "Said notes to be executed by Purchaser herein shall provide for said balance to be paid over a term of ten (10) years, with semi-annual payments of principal, plus interest at the rate of eight per cent (8%) per annum of the unpaid balance of said notes." .

With a reasonable certainty, we can read this contract to provide for twenty *equal* semi-annual *payments of principal*, plus any accrued interest. These terms do not suggest amortized payments. Therefore, we hold that the earnest money contract is valid and enforceable by specific performance.

Having found the earnest money contract to be valid, we do not find it necessary to discuss each of the remaining points of error. It is clear from the evidence that before October 3rd appellant Bumgardner wanted to avoid the earnest money contract because of a sharp decline in land values in the area. He put Weisler, an experienced real estate attorney, on standby and hired Morris, an attorney with little to no real estate experience. Morris sent the letter of October 2nd which specified his two objections to the title before closing—two objections that could only reduce the purchase price and not bring about a cancellation of the contract.

On October 7, 1974, Morris sent a letter to the title company requesting the return of the $25,000 earnest money because the appellees failed to cure the two title objections "that pertain to 10% or more of the acreage," and refused to furnish him with a current survey. On November 6, 1974, Schriewer sent a letter to Liedtke informing him that he was going to retain Morris as his attorney until the $25,000 was returned to him as Morris had previously requested. He made no mention of any problems with the contract, the closing papers, or any other objection. "Defects" involving these papers were not introduced until January 10, 1977, when appellants filed their First Amended Original Answer, and they became more understandable on the first trial day, January 17, 1977, when appellants filed their Second Amended Original Answer.

The two title objections raised by Weisler and later by Morris involved less than 10% of the property. Therefore, by contract these two objections could only reduce the purchase price, not result in destruction of the contract. The contract did not require that appellees provide appellants with a current survey, and Weisler did not request one in his objection letter. Therefore, appellees had no duty to provide one. Consequently, all three reasons given by Morris for cancelling the contract were legally and factually untenable.

We do not permit appellants, once having given their reasons for not performing under the contract, to change completely their reasons for not performing to the detriment of appellees.

It is clear that the closing papers did not conform exactly to the earnest money contract in that they contained three deeds of trust (each requiring $1,400 per acre for partial releases) instead of one deed of trust, and that the appellees did not obtain consent from the holders of the Emma Brown note to create a second lien on the property, or from the five first lien holders to agree to partial releases. But, had appellants raised these defects when refusing to sign the closing papers along with the three they did raise, they could have validly set them all up as defenses. However, because appellants named only the two title problems and the lack of a survey as their grounds for refusal and remained silent as to the other problems, their conduct caused the time to pass without allowing appellees to correct their errors and tender corrected closing papers to them. To paraphrase one court's opinion,

"[T]he reasonable intendment of [appellants'] conduct was to lull [appellees] to inaction and cause [them] to let pass what time and opportunity [they] had to correct the infirmities of the [closing papers], and then, if sued, to reap for [themselves] a benefit from the utterly helpless position into which [they] had induced [their] adversar[ies] to drift."

*Second Nat. Bank v. Lash Corp.*, 299 F. 371, 374 (3rd Cir. 1924). *Accord, Chevrolet Motor Co. v. Gladding*, 42 F.2d 440, 445 (4th Cir.), cert. denied, 282 U.S. 872, 51 S.Ct. 78, 75 L.Ed. 770 (1930). *Luckenbach S.S. Co. v. W. R. Grace & Co.*, 267 F. 676, 679 (4th Cir.), cert. denied, 254 U.S. 644, 41 S.Ct. 14, 65 L.Ed. 454 (1920). *Cf. Ohio & Miss. Ry. v. McCarthy*, 96 U.S. 258, 267–68, 24 L.Ed. 693, 696 (1878). See also *28 Am.Jur.2d Estoppel & Waiver § 72, at 703 (1966)*; *31 C.J.S. Estoppel § 116, at p. 609 (1964)*.

It is clear that if appellants had complained of the three deeds of trust on October 3rd, appellees could have corrected the error as the trial court did in the judgment papers. It is clear that if appellants had complained of the Emma Brown note provision on or before October 3rd, appellees could have obtained written consent for placing a second lien on the property. This situation was remedied by appellees who obtained a written consent from Wayne Giese, President of the Brenham Cemetery Association, the owner and holder of the Emma Brown note on February 15, 1977. It is also clear that if appellants had complained about the lack of provisions for partial releases in the five first lien notes, appellees could have, before, or shortly after October 3rd, attempted to obtain consent from the note holders or, perhaps, prepaid the balance of the notes. If appellants decide to exercise their right to partial releases in the future, then appellees can find a way to remedy the situation; they are obligated by contract to provide partial releases.

Professor Corbin, *3A Corbin on Contracts § 762, at 528 (1960)*, expresses the concept in this manner:

"A buyer of land who points out specific defects in title, as his only stated reason for rejecting it and refusing to pay can not set up other defects as a defense, if those other defects could and would have been cured in time but for the buyer's misleading the seller into thinking that they were regarded as immaterial or were non-existent."

For the reasons stated, and because there were no disputed issues of fact to be submitted to the jury under the applicable standards enunciated earlier, we overrule points of error four through twenty-four. *Henderson v. Travelers Ins. Co.*, supra (544 S.W.2d at 650); *Rogers v. Searle*, supra (544 S.W.2d at 115).

In their final point appellants complain of the admission into evidence of plaintiffs' eighteenth exhibit, a list prepared by Liedtke's secretary showing all interest and tax payments made on the property in question since October 3, 1974. Appellants objected to its unlimited offer at trial but failed to repeat their objection when appellees reoffered it for a limited purpose. As said in *Brown & Root v. Haddad*, 142 Tex. 624, 180 S.W.2d 339, 342 (1944):

"Merely to object to an instrument on the ground that it contains hearsay statements when a portion of the instrument is clearly admissible in evidence, without pointing out the statements claimed to be hearsay, and leveling an objection specifically thereto, does not invoke a ruling by the court on the question of the admissibility of the hearsay statements."

See also *K–Mart No. 4195 v. Judge*, 515 S.W.2d 148, 152 (Tex.Civ.App.—Beaumont 1974, writ dism'd), and authorities therein cited.

Furthermore, Liedtke testified that the payments listed in exhibit eighteen were correct, thus indicating that, although he did not prepare the payment list, he was familiar with the amount of the payments made and was testifying from his own knowledge that they were correct.

Finding no reversible errors, we affirm the judgment of the trial court.